FILED
COURT OF APPEALS
DIVISION II

2015 FEB -3 AM 8: 58

STATE OF WASHINGTON

BY _____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| CHRISTOPHER BOYD, | No. 45174-3-II |
| Respondent, | |
| v. | |
| STATE OF WASHINGTON; DEPARTMENT OF SOCIAL AND HEALTH SERVICES; and WESTERN STATE HOSPTIAL, | UNPUBLISHED OPINION |
| Appellants. | |

Melnick, J. — Western State Hospital (WSH) appeals the jury verdict and judgment against it in Christopher Boyd's employment retaliation case. It argues that the trial court erred when it denied WSH's CR 50 motion because some of the actions Boyd relied on were not adverse employment actions and there was no causal connection between Boyd's actions and the WSH's adverse employment actions. WSH also argues that the trial court erred by allowing Boyd to base

liability on the cat's paw[1] or subordinate bias theory. We hold that Boyd presented substantial evidence of adverse employment actions and a causal connection to support a verdict in his favor. The trial court correctly allowed Boyd to rely on the cat's paw theory where he presented evidence that a supervisor's animus was a substantial factor in WSH's decision to discipline him. We affirm and award Boyd attorney fees on appeal.

## FACTS

### I.   SEXUAL HARASSMENT ALLEGATIONS

Boyd is a registered nurse at WSH. Patricia Maddox was a supervisor in the ward adjacent to Boyd's ward. She would cover Boyd's ward when his ward supervisor was absent. Initially, Maddox treated Boyd affectionately. She bought him t-shirts from her vacations. She would corner Boyd in the nurse's office and sit extremely close to him or position herself in a suggestive

---

[1] Under the "cat's paw" theory, the animus of a non-decision-maker who has a singular influence may be imputed to the decision-maker. *See, e.g., Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011).

> The term "cat's paw" originated in the fable, "The Monkey and the Cat," by Jean de La Fontaine. As told in the fable, the monkey wanted some chestnuts that were roasting in a fire. Unwilling to burn himself in the fire, the monkey convinced the cat to retrieve the chestnuts for him. As the cat carefully scooped the chestnuts from the fire with his paw, the monkey gobbled them up. By the time the serving wench caught the two thieves, no chestnuts were left for the unhappy cat.

Julie M. Covel, *The Supreme Court Writes A Fractured Fable of the Cat's Paw Theory in* Staub v. Proctor Hospital *[Staub v. Proctor Hospital, 131 S. Ct. 1186 (2011)]*, 51 Washburn L.J. 159 (2011). In the workplace, the cat represents an unbiased decision-maker who disciplines an employee unknowingly due to a supervisor's bias, represented by the monkey. Edward Phillips, *The Law at Work:* Staub v. Proctor Hospital: *The Cat's Paw Theory Gets Its Claws Sharpened*, 47 Tenn. B.J. (June, 2011), at 21.

manner. Maddox referred to Boyd as "[h]er penis." 3 Report of Proceedings (RP) at 257. Maddox also made suggestive comments to Boyd while he installed heaters at her house.

In April 2009, Boyd confronted Maddox and told her to leave him alone. Maddox responded by telling Boyd that if he told anyone about the harassment, she would "make sure that [he] can't work in any of the 50 states." 8 RP at 983. After the confrontation, Maddox stopped acting affectionate toward Boyd and became hostile. Boyd did not immediately inform WSH of Maddox's behavior.

II.    INVESTIGATIONS AGAINST BOYD

On December 26, 2009, Boyd delayed assessing a patient. Rod Bagsic, Boyd's co-worker, requested a patient assessment from Boyd at about 1:00 A.M. Boyd did not arrive immediately, and Bagsic called again. Boyd answered the phone and impersonated another employee. Bagsic asked where Boyd was, and Boyd left at that point to assess the patient. Bagsic gave the patient the requested medicine at 2:20 A.M.

Staff reported the incident to Maddox, who reported it to her supervisor. The supervisor directed Paula Cook-Gomez, Boyd's ward supervisor, to investigate the incident. Both Cook-Gomez and Maddox collected witness statements and conducted interviews regarding the incident.

During the investigation, Cook-Gomez overheard Boyd make statements that she perceived as threatening. Boyd had been discussing assault rifles with co-workers and the best way to burn a woman's body. He also demonstrated how to use a chef's knife in an allegedly threatening manner. Another staff member told Cook-Gomez that Boyd said, "[T]hey may fire me[,] but they will sure as hell remember me." Ex. 94.

WSH assigned Maddox to investigate Boyd's alleged threats. On January 21, 2010, as a result of the ongoing investigation, WSH reassigned Boyd to another ward. He was not allowed

patient interaction during his reassignment. WSH also reported Boyd's conduct to both the Department of Health and the police.

During an e-mail exchange on January 22, 2010, Maddox told Cook-Gomez "I don't trust [Boyd] about anything as he is known to lie." 3 RP at 349. On January 26, 2010, Boyd told Maddox's supervisor that Maddox's presence at his disciplinary meeting made him uncomfortable. The supervisor e-mailed a Human Resources representative, who stated that Maddox could still attend the meeting and WSH would explain her presence as a training exercise.

At the disciplinary meeting, the witness who overheard Boyd say, "[T]hey may fire me, but they will sure as hell remember me," told Maddox that Boyd's comment related to apple cider and she did not perceive it as threatening. Ex. 23. Maddox discussed the witness's "apple cider" explanation with Human Resources but did not include it in the report she provided to WSH's management. 3 RP at 358-59. Boyd asserted that his other comments were not meant as threats. Instead, he said they related to conversations about a television show, military training, and being careful with a knife while cooking.

Cook-Gomez and Maddox reported their findings to the Management Resource Team.[2] The Management Resource Team reviewed the investigations and decided to present both matters to the Chief Executive Officer (CEO) and recommend that Boyd be disciplined.

In October 2010, the CEO sent Boyd a "Notice of Intent to Discipline." Ex. 116. In December 2010, Boyd's attorney sent a letter to WSH regarding his sexual harassment allegations against Maddox. At that time, WSH decided to have David Rivera re-investigate all of the allegations against Boyd. First, Rivera limited his investigation of Boyd's alleged threats to

---

[2] The Management Resource Team includes Human Resources representatives, an incident management representative, the nurse executive, and sometimes nursing supervisors.

Boyd's statement "they may fire me, but they will sure as hell remember me."[3] 10 RP at 1426-27. After Rivera learned that the witness recanted her statement, Rivera closed his investigation without examining any of Boyd's other allegedly threatening statements.

Then, Rivera re-investigated the allegations that Boyd had failed to assess a patient. In exploring this matter, Rivera relied, in part, on the statements and interviews prepared by Maddox as well as his own interviews with witnesses. Rivera initially had difficulty scheduling an interview with Boyd. WSH ultimately decided to not re-interview Boyd. It relied on the interview conducted by Cook-Gomez and Maddox. Based on Rivera's findings, WSH concluded that the original investigation was fair.

On January 5, 2012, Boyd received a letter from WSH's CEO suspending him for two weeks without pay for failing to assess a patient and for impersonating a co-worker. On January 30, 2012, WSH's CEO issued Boyd a written reprimand for making threatening comments. The reprimand relied on Maddox's report. The reprimand listed Boyd's alleged comments, including statements about the damage a chef's knife could cause, how to burn a woman's body so it would be unidentifiable, the use of sniper rifles and AK-47s, and how WSH may fire him but it will remember him. WSH forwarded the reprimand to Boyd's new supervisor. Although other employees participated in the conversations about guns and burning bodies, only Boyd was disciplined.

III. PROCEDURE

On March 19, 2012, Boyd filed a complaint against WSH under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, alleging sexual harassment and retaliation.

---

[3] Initially Rivera misspoke when he testified as to what another LRN said, but corrected himself. This quote reflects his correction.

CP at 1. WSH moved for summary judgment. It argued that both the sexual harassment and retaliation claims should be dismissed. The trial court granted WSH's motion for summary judgment regarding the sexual harassment claim but denied the motion regarding the retaliation claim.

The case proceeded to jury trial and at the close of Boyd's case, WSH moved for judgment as a matter of law under CR 50. It argued that four of the bases for adverse employment actions—the investigation of Boyd's threatening comments, his written reprimand, and the two transfers to different wards—were not actionable. It also argued that Boyd failed to show a causal link between the protected activity and any adverse employment actions. Finally, it argued that it had non-retaliatory reasons for investigating Boyd. The trial court denied WSH's CR 50 motion.

The trial court gave the following "adverse employment action" instruction over WSH's objection:

> An adverse employment action is defined as an employment action or decision that constitutes an adverse change in the circumstances of employment. An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making complaints of sexual harassment or retaliation. An adverse employment action must involve a change in employment conditions that is more than an inconvenience or alteration of job responsibilities.

Clerk's Papers (CP) at 2160.

The trial court gave the following "cat's paw" instruction over WSH's objection:

> If a supervisor performs an act motivated by retaliatory animus that is intended by the supervisor to cause an adverse, employment action, and if that act is relied on by the employer and is a substantial factor in the ultimate employment action, then the employer is liable for retaliation.

CP at 2162.

The trial court rejected WSH's 17-question proposed special verdict form, which listed several different alleged adverse employment actions. Instead, the trial court used a special verdict

form that asked whether "the defendant retaliate[d] against the plaintiff," and, if so, what is the total amount of damages. CP at 2169-70.

The jury found that WSH had retaliated against Boyd and awarded him $173,000. WSH appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

We review a trial court's denial of a CR 50 motion for judgment as a matter of law de novo, engaging in the same inquiry as the trial court. *Schmidt v. Coogan*, 162 Wn.2d 488, 491, 173 P.3d 273 (2007). Judgment as a matter of law is proper only when, viewing the evidence in the light most favorable to the nonmoving party, substantial evidence cannot support a verdict for the nonmoving party. *Schmidt*, 162 Wn.2d at 491, 493.

We review alleged errors of law in jury instructions de novo. *Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160*, 151 Wn.2d 203, 210, 87 P.3d 757 (2004). Jury instructions are proper when they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of applicable law. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995).

To establish a prima facie case of retaliation for a protected activity under the WLAD[4], an employee must show that (1) he engaged in a statutorily protected activity, (2) the employer took an adverse employment action against the employee, and (3) there is a causal connection between

---

[4] It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.

RCW 49.60.210(1).

the employee's activity and the employer's adverse action. *Estevez v. Faculty Club of Univ. of Wash.*, 129 Wn. App. 774, 797, 120 P.3d 579 (2005); *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 446, 334 P.3d 541 (2014). If the employee establishes a prima facie case, then the employer may rebut the claim by presenting evidence of a legitimate nondiscriminatory reason for the adverse action. *Estevez*, 129 Wn. App. at 797-98; *Scrivener*, 181 Wn.2d at 446. The burden then shifts back to the employee to show that the employer's reason is pretext. *Estevez*, 129 Wn. App. at 798; *Scrivener*, 181 Wn.2d at 446. Once "the record contains *reasonable but competing* inferences of *both* discrimination *and* nondiscrimination, 'it is the jury's task to choose between such inferences.'" *Estevez*, 129 Wn. App. at 798 (quoting *Hill v. BTCI Income Fund-I*, 144 Wn.2d 172, 186, 23 P.3d 440 (2001)) (other citations omitted). Here, WSH argues that Boyd failed to prove that WSH took an adverse employment action and, even if he had shown adverse employment actions, there is no causal connection between Boyd's protected activities and any adverse employment actions.

II.    ADVERSE EMPLOYMENT ACTIONS

First, WSH argues that the trial court erred when it failed to limit Boyd's claimed adverse employment actions. Specifically, it asserts that the trial court erred when it denied WSH's CR 50 motion arguing that some of the retaliatory actions Boyd alleged were not adverse employment actions, gave an adverse employment action jury instruction that was contrary to law, and failed to give WSH's proposed verdict form.

A.    CR 50 Motion

WSH argues that the trial court erred when it denied WSH's CR 50 motion to dismiss because Boyd failed to prove that WSH took an adverse employment action against him. We disagree.

8

An adverse employment action involves a change in employment that is more than an inconvenience or alteration of one's job responsibilities. *Alonso v. Qwest Commc'ns Co., LLC*, 178 Wn. App. 734, 746, 315 P.3d 610 (2013). It includes a demotion or adverse transfer, or a hostile work environment. *Kirby v. City of Tacoma*, 124 Wn. App. 454, 465, 98 P.3d 827 (2004 (quoting *Robel v. Roundup Corp.*, 148 Wn.2d 35, 74 n.24, 59 P.3d 611 (2002)). The employee must show that a reasonable employee would have found the challenged action materially adverse, meaning that it would have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (2006)). "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position.'" *Tyner v. State*, 137 Wn. App. 545, 565, 154 P.3d 920 (2007) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71).

The trial court correctly declined to determine as a matter of law that WSH's actions were not adverse employment actions. Washington courts look to federal antidiscrimination law to construe the WLAD and we are "free to adopt th[e]se theories" which further the purposes of our state statute. *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 491, 325 P.3d 193 (2014) (quoting *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 361–62, 753 P.2d 517 (1988)). Federal law provides that context matters in analyzing the significance of any given act of retaliation because "'[a]n act that would be immaterial in some situations is material in others.'" *Burlington N. & Santa Fe Ry Co.*, 548 U.S. at 69 (quoting *Wash. v. Illinois Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)). Accordingly, whether a particular action would be viewed as adverse by a reasonable employee is a question of fact appropriate for a jury. *See Burlington*, 548 U.S. at 71-

73; *McArdle v. Dell Products, L.P.*, 293 F. Appx. 331, 337 (5th Cir. 2008) ("Whether a reasonable employee would view the challenged action as materially adverse involves questions of fact generally left for a jury to decide.").

Here, viewing the evidence in the light most favorable to Boyd, there is substantial evidence WSH engaged in adverse employment actions. *See Schmidt*, 162 Wn.2d at 491, 493. Boyd presented evidence that WSH suspended him for two weeks without pay, issued a written reprimand that contained a detailed list of his alleged threatening comments and disseminated it to his supervisor, removed Boyd from his ward and from patient interaction, and reported him to the Department of Health and the police. WSH argues that some of these actions were not adverse employment actions; rather, they were "legitimate business decisions" that were disciplinary or investigatory in nature. Appellant's Br. at 24-25 (citing *Kirby*, 124 Wn. App. at 465 (employment events that were disciplinary or investigatory in nature did not constitute adverse employment actions where there were mere inconveniences that did not have a tangible impact on the plaintiff's workload or pay)). We express no opinion as to whether these employment actions, taken individually, constituted adverse employment actions as a matter of law. However, taken in context, a reasonable jury could find that these actions, taken together, were materially adverse. Boyd presented substantial evidence for the jury to find that these actions would have dissuaded a reasonable worker from making a discrimination charge. *See Burlington*, 548 U.S. at 68.

B. Jury Instruction

WSH further argues that the trial court's adverse employment action jury instruction was contrary to law. The trial court's instruction was:

> An adverse employment action is defined as an employment action or decision that constitutes an adverse change in the circumstances of employment. An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making complaints of sexual harassment or retaliation.

10

An adverse employment action must involve a change in employment conditions that is more than an inconvenience or alteration of job responsibilities.

CP at 2160. At trial, WSH objected to the instruction because the second sentence is derived from federal case law.

The trial court used language from the Supreme Court's opinion in *Burlington*, 548 U.S. 53, a Title VII retaliation case, in the adverse employment action instruction. The *Burlington* court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" 548 U.S. at 68 (quoting *Rochon*, 438 F.3d at 1219) (citations omitted). Washington courts look to federal case law interpreting Title VII to guide interpretations of the WLAD. *Kumar*, 180 Wn.2d at 491; *see also Tyner*, 137 Wn. App. at 565 (citing *Burlington*, 548 U.S. at 68); *Kirby*, 124 Wn. App. at 465 (citing federal cases as guidance for determining whether an event is an adverse employment action). Therefore, the trial court properly incorporated the *Burlington* language into its instruction and did not err.

C.    Verdict Form

Next, WSH argues that the trial court erred when it used a simpler verdict form and not WSH's 17-question proposed verdict form.[5] This argument is based on WSH's assertion that the trial court erred by failing to limit the alleged adverse employment actions presented to the jury. WSH cites *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 539, 70 P.3d 126 (2003), to support its argument. The *Davis* court stated that "where a general verdict is rendered in a multitheory case and one of the theories is later invalidated, remand must be granted if the defendant purposed a

---

[5] Boyd argues that WSH did not preserve an objection to the verdict form. We disagree. Although WSH ultimately accepted the trial court's verdict form, this was after WSH proposed and argued for a different verdict form.

11

clarifying special verdict form." 149 Wn.2d at 539. But, as discussed above, the trial court did not err when it allowed Boyd to present all of his alleged adverse employment actions to the jury. Therefore, *Davis* is inapposite and this argument fails.

Further, a trial court's refusal to submit a special verdict form based on the facts of that case is reviewed for abuse of discretion. *State v. Lucky*, 128 Wn.2d 727, 731, 912 P.2d 483 (1996), *overruled on other grounds* by *State v. Berlin*, 133 Wn.2d 541, 947 P.2d 700 (1997). A trial court abuses its discretion when its discretionary decision is "manifestly unreasonable or based upon untenable grounds or reasons." *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 77, 684 P.2d 692 (1984) (citing *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). Here, the trial court stated it was "concerned" the special verdict form had "too many questions, that it's broken down too much." 12 RP at 1828. The trial court made it clear that, in light of the facts of this case, WSH's proposed jury form was not "something that a jury could work with." 12 RP at 1832. WSH's proposed 17-question special verdict form is cumulative and confusing. Many of the questions overlap with the jury instructions provided and require the jurors to answer the questions out of order. Therefore, the trial court's decision to not give WSH's special verdict form was reasonable and exercised on tenable grounds. The trial court did not abuse its discretion.

III.    CAUSAL CONNECTION

WSH next argues that the trial court erred when it denied WSH's CR 50 motion because Boyd failed to provide evidence establishing a causal connection between his activity and WSH's adverse employment actions. WSH asserts that there was no evidence that the decision makers were aware of the sexual harassment claims until after WSH began the investigations against Boyd and there was no evidence that Maddox was involved with the decision to discipline Boyd. Although WSH is correct that it did not have notice of Boyd's sexual harassment claim until after

it had started the investigations into Boyd's conduct, the adverse employment acts commenced after Maddox threatened Boyd to not report her harassment of him. He presented evidence that Maddox's actions were a substantial factor in the investigations and resulting discipline. Rivera's investigation did not break the causal connection between her animus and the adverse employment actions.

"[A] plaintiff bringing suit under RCW 49.60.210 must prove causation by showing that retaliation was a substantial factor motivating the adverse employment decision." *Allison v. Hous. Auth. of City of Seattle*, 118 Wn.2d 79, 96, 821 P.2d 34 (1991). In *Staub v. Proctor Hospital*, 562 U.S. 411, 131 S. Ct. 1186, 1191, 179 L. Ed. 2d 144 (2011), the Supreme Court confronted the problem where the official who made the decision to take an adverse employment action "has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else." There, the plaintiff, a member of the Army Reserve, was fired and sued his employer under the Uniformed Services Employment and Reemployment Rights Act (USERRA). *Staub*, 131 S. Ct. at 1190. He alleged that his supervisor's antimilitary animus influenced his employer's decision to terminate him. *Staub*, 131 S. Ct. at 1190. The Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."[6] *Staub*, 131 S. Ct. at 1194 (footnotes omitted).

The Court also stated that an independent investigation does not necessarily relieve the employer of liability for an adverse employment action. *Staub*, 131 S. Ct. at 1193. "[I]f the

_____

[6] We applied subordinate bias liability as it is articulated in *Staub* in *City of Vancouver v. Wash. Pub. Emp't Relations Comm'n*, 180 Wn. App. 333, 325 P.3d 213 (2014).

employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable." *Staub*, 131 S. Ct. at 1193. "But if the independent investigation relies on facts provided by the biased supervisor—as is necessary in any case of cat's-paw liability—then the employer (either directly or through the ultimate decision [ ] maker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor." *Staub*, 131 S. Ct. at 1193.

Here, Boyd presented evidence of Maddox's animus. He testified that, after he told her to stop harassing him she became hostile and threatened to "make sure [he] can't work in any of the 50 states." 8 RP at 983. Subsequently, Maddox involved herself in investigating the complaints against Boyd. Although Cook-Gomez was assigned to investigate Boyd's failure to assess the patient, Maddox collected witness statements and conducted some of the interviews. WSH assigned Maddox to investigate Boyd's threatening comments. Maddox wrote in an e-mail to Cook-Gomez that "[she didn't] trust [Boyd] about anything as he is known to lie." 3 RP at 349. WSH relied on Maddox's investigation and factfinding in disciplining Boyd. Therefore, a jury could find that Maddox's acts were a proximate cause of the adverse employment actions.

Rivera's additional investigations are not supervening causes. Rivera's re-investigation of Boyd's failure to assess the patient relied on facts provided by the biased supervisor, Maddox. At the time of Rivera's investigation, some witnesses could not clearly recall the events and instead relied on the statements collected by and interviews Maddox conducted. And, Rivera did not re-investigate Boyd's threatening comments. Although Maddox's report included several different comments and the CEO's reprimand mentioned the same comments, Rivera only investigated one of the alleged comments—"they may fire me, but they will sure as hell remember me." 10 RP at 1426. He stopped his investigation after learning that the witness who reported this statement had

recanted. The trial court did not err when it denied WSH's CR 50 motion on a lack of a causal connection.

IV.    "CAT'S PAW" INSTRUCTION

Next, WSH argues that the trial court erred when it gave the cat's paw instruction. It contends that Maddox did not act with discriminatory animus, Rivera's investigation was a supervening cause of any animus, and the instruction was inconsistent with the jury instruction on retaliation. We disagree.

First, Boyd presented evidence that Maddox acted out of animus. Before the investigations began, she told Boyd that she would "make sure [he] can't work in any of the 50 states" after he rejected her advances. 8 RP at 983. She also told Cook-Gomez, the other investigator, that she knew Boyd was a liar. Maddox then reported Boyd's conduct to management and assisted with fact-gathering for both investigations against Boyd. WSH relied on those facts in determining Boyd's discipline.

Second, Rivera's investigation was not a supervening cause. His review of Cook-Gomez's investigation relied on information Maddox prepared. And he did not complete a review of Maddox's investigation. Instead, he stopped his review after determining that a witness to one of the alleged threats had recanted. Despite this lack of an independent investigation, WSH reprimanded Boyd for all of his alleged threatening comments.

Third, the "cat's paw" instruction was not inconsistent with the substantial factor requirement. The "cat's paw" instruction read, "If a supervisor performs an act motivated by retaliatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is relied on by the employer and is a substantial factor in the ultimate employment action, then the employer is liable for retaliation." CP at 2162. This instruction is consistent with the law

on subordinate bias liability. "[I]f a supervisor performs an act motivated by . . . animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub*, 131 S. Ct. at 1194 (footnotes omitted). Under Washington law, in order for the act to be a proximate cause, it must be a substantial factor. *City of Vancouver v. Wash. Pub. Emp't Relations Comm'n*, 180 Wn. App. 333, 356, 325 P.3d 213 (2014) ("a complainant seeking to use the subordinate bias theory of liability must show that the subordinate's animus was a substantial factor in the decision"). The trial court's instruction properly informed the jury of the law. It required the plaintiff to prove that the supervisor's animus was a substantial factor in the decision. The trial court did not err when it gave the cat's paw instruction.

V.    PRETEXT

Finally, Boyd met his burden of showing that WSH's reasons for disciplining him were pretext. *See Estevez*, 129 Wn. App. at 798. WSH presented nondiscriminatory reasons for disciplining Boyd: he failed to timely assess a patient and he made inappropriate comments. Boyd then presented evidence that the reasons were pretext. Maddox told Boyd she would retaliate, he was the only employee disciplined for inappropriate comments even though other employees were engaged in the conversations, and WSH disciplined him for making threatening statements even though it had notice of Maddox's bias and failed to conduct a thorough independent investigation. Once "the record contains *reasonable but competing* inferences of *both* discrimination *and* nondiscrimination, 'it is the jury's task to choose between such inferences.'" *Estevez*, 129 Wn. App. at 798 (quoting *Hill*, 144 Wn.2d at 186). Juries are empaneled to determine credibility of witnesses and to weigh evidence. We do not disturb those on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Here, the jury chose to believe Boyd. We affirm.

## VI. ATTORNEY FEES

Boyd requests attorney fees under RAP 18.1 and RCW 49.60.030. RCW 49.60.030(2) states,

> Any person deeming himself or herself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees.

Because WSH's appeal fails, we award Boyd attorney fees on appeal. *Martini v. Boeing Co.*, 137 Wn.2d 357, 377, 971 P.2d 45 (1999).

We affirm and award Boyd attorney fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Johanson, C.J.

Bjorgen, J.